UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

No. 1:26-cv-01627

**Galvez,**
*Plaintiff,*
v.
**Land, et al.,**
*Defendants.*

## MEMORANDUM OPINION AND ORDER

Plaintiff Matthew S. Galvez ("Galvez") moves to remand this business dispute back to the Texas Business Court, arguing that there is no diversity jurisdiction because both he and multiple defendants are Texas citizens. The removing defendants disagree, arguing that Galvez is not a Texas citizen and that, even if he were, there is complete diversity because the Texas citizen defendants were fraudulently joined.

The Court agrees with Galvez. Galvez is a Texas citizen who has stated at least one claim against at least one Texas defendant, so this Court lacks jurisdiction under 28 U.S.C. §§ 1441 and 1446. The motion to remand is thus granted, and the case is remanded to the Texas Business Court.

## BACKGROUND

The following facts are related in the light most favorable to Galvez.

### A. Galvez relinquishes control of Elgin Butler Company to Douglas Land and agrees to a restructuring.

This case begins in 2005 when Galvez became a majority shareholder in the historic Elgin Butler Company after buying

ownership interest from the Butler family. ECF No. 1, Ex. C at ¶ 2 ("Pet."). The Elgin Butler Company has operated a brick manufacturing facility in Texas since the 1870s. When Galvez became the majority shareholder, he managed the Company's affairs, including its brick manufacturing.

But things began to change in 2015. That year, Galvez unexpectedly "suffered a near-fatal heart attack, requiring quintuple bypass and five stents." *Id.* at ¶ 3. Five years later, in 2020, Galvez was diagnosed with "potentially terminal cancer" that required chemotherapy and surgery at the MD Anderson Cancer Center. *Id.* Galvez alleges that, unable to manage the business any longer, he turned to "a trusted friend, business partner and the executor of his estate for help in keeping Elgin Butler afloat." *Id.* That friend was Douglas S. Land, who did business through two of his own corporate entities: DSL Capital and The Chesapeake Group. *Id.* at ¶ 4. This Court refers to Land and his associated entities as the "Land Defendants."

In June 2020, Galvez signed a Memorandum of Understanding (written by Land) for a plan to restructure Elgin Butler Company to improve operations and attract new buyers. Galvez alleges that he and Land agreed that Galvez would remain the principal equity holder in the restructured company, and that Land would retain a minority share and act as Galvez's agent in running the business. Galvez also alleges that he invested $600,000 to carry out the restructuring, consistent with his and Land's agreement.

Land reorganized the Elgin Butler Company into the Elgin Butler Brick Company LLC ("Elgin Butler Brick"), a Texas limited liability corporation. Land also "interacted only occasionally with Galvez," sometimes asking for his help in supporting the new company. *Id.* at ¶ 5. Galvez alleges that, around this time, Land and a Houston financier, Frank

Goldberg, persuaded him to sell his $5 million life insurance policy (which seemed likely to pay out given his illness) in order to infuse Elgin Butler Brick with further capital. And, "[a]s late as 2024, Galvez was also persuaded to sign over deeds to parcels" of Elgin Butler Brick's real property. *Id.* He "acceded to these requests with the ongoing understanding that he was, as he had always been, the majority equity holder[.]" *Id.*

### B. Galvez learns that Land sold Elgin Butler Brick's assets and stripped him of his membership years earlier.

In late 2024, Land told Galvez that he could not make Elgin Butler Brick profitable, and that he "sold the principal assets of the company, including its real estate, to a new buyer." *Id.* at ¶ 6. More, Land told Galvez that the new buyer intended to "effectively shut down" brickmaking and lay off all employees. *Id.*

Naturally, Galvez inquired about specific details of the sale, including the name of the buyer, the purchase price, and the particulars of how proceeds would be distributed. But Land rebuffed him. Galvez alleges that Land told him that Elgin Butler Brick had suffered losses from inception, and that nothing was materially gained from the sale. Land then offered Galvez $100,000 "to resolve the millions of dollars Galvez had put into the business." *Id.* at ¶ 7. When Galvez asked Land to see the books and records of Elgin Butler Brick, Land again allegedly denied him the information.

Months of back-and-forth ensued, and eventually Land offered Galvez $900,000 to settle accounts, but he still refused to divulge any financial information. Galvez declined this proposal, so "Land cut off communication and demanded that any further interaction be with Land's lawyers." *Id.* at ¶ 7. In

response, Galvez hired counsel, and alleges that when his attorneys investigated the situation, they discovered that Galvez had been stripped of legal membership in the restructured company Land had created in July 2020, while he was hospitalized for cancer treatment. *Id.* at ¶ 8.

Galvez alleges that he also discovered that the 2024 Elgin Butler Brick asset sale was not an arm's length third-party transaction because the buyer (and one of the Defendants) Elgin FM 696 Property Owner LLC ("Elgin FM") is a company in which Land maintains an interest. Galvez claims that the sale price of the land was under its market value, and so Elgin FM—and by extension, Land—"stands to gain enormously from any prospective resale from this self-dealing transaction." *Id.* at ¶ 10.

### C. Galvez alleges a broader pattern of self-dealing by Land, aided by the Briar Defendants.

The litany of allegations do not end there. Galvez asserts that Land spun off a subsidiary that Galvez had purchased and incorporated into the now-Elgin Butler Brick and removed all legal interest Galvez had retained in the company, thus "misappropriat[ing] a company Galvez spent millions of dollars to purchase and build." *Id.* at ¶ 11. In addition, Galvez alleges that Land arranged for a $570,000 Paycheck Protection Program loan for the original Elgin Butler Company for use by Elgin Butler Brick, but without Galvez's knowledge or consent *and* without his signature as owner of the Elgin Butler Company. Land later "took the money and subsequently applied for loan forgiveness, still in the name of the old (and now dissolved) Elgin Butler Company owned by Galvez . . . without [his] knowledge or consent." *Id.* at ¶ 12.

Further, Galvez alleges that in February 2021, the Elgin Butler production facilities sustained significant damage from

the historic freeze and later power outages in Texas. And, "[o]n information and belief, Land applied for and recovered millions of dollars in storm insurance proceeds associated with that damage, but spent little of it on rebuilding Elgin Butler, instead taking substantial sums for his personal benefit." *Id.* at ¶ 13.

Galvez also alleges that Land "engaged in a series of transactions" involving Frank Goldberg and his corporate entities—Briar Capital Real Estate Fund, LLC, Briar Capital General, LLC, and Briar Capital, LP—that purported to move the assets of the Elgin Butler Company into Elgin Butler Brick (in which he had no legal ownership interest) without disclosing these transfers to Galvez. Despite learning of this in November 2025, Galvez claims that he was defrauded in these transactions and that Goldberg and his entities (collectively, the "Briar Defendants") "were fully aware of and conspired with Land in this fraudulent scheme to deprive Galvez of his equity in the restructured Elgin Butler." *Id.* at ¶ 14.

More, Galvez alleges that Land claimed significant operating losses each year he operated Elgin Butler Brick, both claiming those losses for his personal tax benefit and excluding Galvez from any benefit. To sum, Galvez alleges that Land—when exercising "full control" as Galvez's agent to manage the Elgin Butler Company (and two other corporate entities Galvez folded into the company)—"engaged in gross mismanagement and self-dealing, causing the business to incur substantial losses, while Land reaped substantial gains, placing Land's own interests above those of Galvez or the business." *Id.* at ¶ 16.

**D. Galvez files this suit and the Land Defendants removed to this Court.**

Galvez filed a suit against Defendants in Bastrop County in June 2026, alleging fraud, conspiracy to commit fraud, breach of fiduciary duty, breach of contract, unjust enrichment, accounting, and seeking a declaratory judgment, exemplary damages, and attorneys' fees. Pet. at 9–14. The next day, Land Defendants removed first to the Texas Business Court, and then to this Court. *See* ECF No. 1, Ex. B. Once in this Court, filings proceeded apace in rapid succession. Land Defendants amended their notice of removal twice within 30 days of the original state court suit's filing. *See* ECF Nos. 10, 15. Elgin FM and the Land Defendants filed separate motions to dismiss, ECF Nos. 18, 27; the Briar Defendants simply answered, ECF No. 13 ("Briar Answer").

With the dust settled, the Court is left with a ripe motion to remand. And with full briefing in hand, the Court now addresses its own jurisdiction.

## Legal Standard

"A party may remove an action from state court to federal court if the action is one over which the federal court possesses subject matter jurisdiction." *Manguno v. Prudential Prop. & Cas. Ins. Co.*, 276 F.3d 720, 723 (5th Cir. 2002) (citing 28 U.S.C. § 1441(a)). The removing party has the burden of proof in demonstrating that removal to federal court is proper. *Gasch v. Hartford Acc. & Indem. Co.*, 491 F.3d 278, 281 (5th Cir. 2007).

For a case to be removed based on diversity jurisdiction, "all persons on one side of the controversy [must] be citizens of different states than all persons on the other side." *Harvey v. Grey Wolf Drilling Co.*, 542 F.3d 1077, 1079 (5th Cir. 2008) (citation omitted). This means that no plaintiff can be a citizen

of the same state as any defendant. Moreover, under 28 U.S.C. § 1441(b)(2), a case cannot be removed based on diversity jurisdiction if any properly-joined defendant is a citizen of the state in which the action is brought.

When determining whether there is complete diversity, courts must disregard the citizenship of any party who has been improperly joined. *Smallwood v. Illinois Cent. R.R. Co.*, 385 F.3d 568, 572–73 (5th Cir. 2004) (en banc). Doing so allows federal courts to defend against attempts to join non-diverse parties solely to destroy diversity jurisdiction. *See id.* at 576. Because "the effect of removal is to deprive the state court of an action properly before it, removal raises significant federalism concerns." *Gasch*, 491 F.3d at 281 (citation omitted). Out of respect for these federalism concerns, removal is strictly construed, with "any doubt about the propriety of removal [being] resolved in favor of remand." *Id.* at 281–82. Moreover, the Court "resolve[s] all contested factual issues and ambiguities of state law in favor of the plaintiff" when determining whether a party has been improperly joined. *Id.* at 281. The party seeking removal thus bears a heavy burden to prove improper joinder. *Smallwood*, 385 F.3d at 574.

A removing party can establish improper joinder in two ways: "(1) actual fraud in the pleading of jurisdictional facts, or (2) inability of the plaintiff to establish a cause of action against the non-diverse party in state court." *Smallwood*, 385 F.3d at 573. Proceeding under the second way, the Court "may conduct a Rule 12(b)(6) analysis, looking initially at the allegations of the complaint to determine whether the complaint states a claim under state law against the in-state defendant." *Id.* Rule 12(b)(6) entitles a defendant to dismissal when the complaint "fail[s] to state a claim upon which relief can be granted." FED R. CIV. P. 12(b)(6). This Rule 12(b)(6) standard, combined with the requirement to resolve any

ambiguities of state law in favor of the plaintiff, requires the removing defendant to establish based on the pleadings that "there is no possibility of recovery by the plaintiff against an in-state defendant." *Smallwood*, 385 F.3d at 573. "[S]tated differently," a party is fraudulently joined only when there is "no reasonable basis for the district court to predict that the plaintiff might be able to recover against" that defendant. *Id.*; *see also Travis v. Irby*, 326 F.3d 644, 648 (5th Cir. 2003) (explaining that the terms "no possibility" of recovery and "reasonable basis" for recovery have essentially identical meanings, and holding that pleadings must show more than "any mere theoretical possibility of recovery").

## ANALYSIS

This Court lacks diversity jurisdiction—and thus this case was erroneously removed—because both Plaintiff Galvez and the Briar Defendants are Texas citizens. The Land Defendants dispute this in two ways. First, they argue that Galvez is in fact a citizen of Wyoming, not Texas. Second, they argue that, even if Galvez is a Texas citizen, the Briar Defendants were fraudulently joined and thus do not count for purposes of determining complete diversity. Both arguments fail.

### A. Galvez is a Texas citizen.

The evidence presented establishes that Galvez is a Texas citizen. For natural persons, "citizenship has the same meaning as domicile, and the place of residence is prima facie the domicile." *MidCap Media Fin., L.L.C. v. Pathway Data, Inc.*, 929 F.3d 310, 313 (5th Cir. 2019) (quoting *Stine v. Moore*, 213 F.2d 446, 448 (5th Cir. 1954) (internal quotation marks omitted)). "Citizenship requires not only '[r]esidence in fact' but also 'the purpose to make the place of residence one's home.'" *Id.* (quoting *Texas v. Florida*, 306 U.S. 398, 424 (1939)). Courts therefore "look to all evidence shedding light on the litigant's

intention to establish domicile." *Coury v. Prot*, 85 F.3d 244, 251 (5th Cir. 1996). This includes "the places where the litigant exercises civil and political rights, pays taxes, owns real and personal property, has driver's and other licenses, maintains bank accounts, belongs to clubs and churches, has places of business or employment, and maintains a home for his family." *Id.*

Galvez produced a declaration demonstrating that he resides in Texas and that he makes, and plans to continue to make, Texas his domicile. Specifically, he avers that he (1) maintains his primary home in Austin, Texas; (2) files his federal income taxes as a Texas resident; (3) holds residence-homestead and over-65 exemptions on his Austin home (available because it is his principal residence); (4) banks and maintains brokerage relationships in Austin; (5) maintains vehicles that are registered and insured in Texas; (6) carries Texas health insurance; (7) maintains a Texas estate plan; and (8) centers his civic and social life in Austin. ECF No. 22-1; ECF No. 16 at 3. Together, these facts are strong evidence that he is a Texas citizen.

The Land Defendants argue that he is instead a Wyoming citizen, and they point to multiple pieces of evidence to support this argument. None persuade.

*First*, the Land Defendants latch on to the undisputed fact that Galvez has a house in Jackson Hole, Wyoming. They argue that this is his primary residence because he listed the Jackson Hole address as his "home address" in a 2014 financial statement and agreed in a 2021 mortgage to maintain that address as his "principal residence" for one year. ECF No. 15 at 6, 7 ("Live Removal Notice"). But Galvez's residence in 2014 or 2022 is not controlling because "the jurisdiction of the court depends upon the state of things at the time of the action brought"—here, 2026. *Grupo Dataflux v. Atlas Glob. Grp., L.P.*,

541 U.S. 567, 570 (2004). Evidence of a previous residence may in some circumstances illuminate a party's current residence. But not here. Galvez explained in his declaration that it is no longer his primary residence, especially now that he is divorced and has access to the property only during set months of the year.

*Second*, the Land Defendants point to a District of Nebraska decision stating that Galvez is "a Wyoming citizen." *AuSable Cap. Partners, LLC v. Sati Exports India Priv. Ltd.*, No. 8:21-cv-129, 2024 WL 4685322, at *1, 4 (D. Neb. Aug. 6, 2024). But this suit was filed in 2021, so the Court's citizenship determination says no more about Galvez's citizenship in 2026 than the 2021 mortgage.

*Third*, the Land Defendants rely on a Lexis SmartLinx Person Report stating that Galvez has (and has had for years) a Wyoming driver's license (issued in 2022 and expiring in 2027) and that there is no evidence he is registered to vote in Texas. Live Removal Notice at 6–7; Ex. 6 at 1. Galvez does not dispute this. He admits that although he has a Texas ID, he has not transferred his driver's license from Wyoming to Texas. He also admits that he still has not transferred his voting registration. These pieces of evidence weigh somewhat in favor of finding that he is domiciled in Wyoming, but they are not nearly enough to overcome all the other evidence pointing to his intent to be domiciled in Texas as a member of the Austin community.

*Fourth*, the Land Defendants observe that Galvez is a licensed attorney in New York and is the sole founder and managing partner of a private equity fund based in California. Live Removal Notice at 7. This, too, is unpersuasive. Galvez is not a practicing attorney, so he has no need to switch his license to the state in which he is domiciled. And no party seriously contends that he is domiciled in California.

In short, although Galvez likely was a citizen of Wyoming in the past and still has some ties to Wyoming, he is a Texas citizen for purposes of this suit because he was a Texas citizen when this suit was filed.

**B. The Briar Defendants are properly joined.**

Because Galvez is a Texas citizen and has brought claims against multiple Texas citizen defendants, this Court lacks diversity jurisdiction so long as *one* claim against *one* of those defendants is proper. The Court can only disregard these defendants when assessing diversity jurisdiction if there is "no reasonable basis for [the Court] to predict that [Galvez] might be able to recover against" these defendants on any of his claims. *Smallwood*, 385 F.3d at 573. That is not the case here. Galvez has pleaded a civil conspiracy to commit fraud claim against the Briar Defendants. The Land Defendants disagree, arguing that this claim is pleaded inadequately and is time-barred. But both arguments fail.[1]

**A. Galvez pleaded a civil conspiracy claim against the Briar Defendants.**

Under Texas law, an action for civil conspiracy has five elements: "(1) a combination of two or more persons; (2) the persons seek to accomplish an object or course of action; (3) the persons reach a meeting of the minds on the object or course of action; (4) one or more unlawful, overt acts are taken in pursuance of the object or course of action; and (5) damages occur as a proximate result." *First United Pentecostal Church of Beaumont v. Parker*, 514 S.W.3d 214, 222 (Tex. 2017) (citation omitted). Civil conspiracy "requires specific intent to agree to accomplish something unlawful or to accomplish something

[1] Galvez has pleaded other claims against Texas citizen defendants. The Court does not address those claims.

lawful by unlawful means." *Id.* (citation omitted). So, only parties "who are aware of the intended harm or proposed wrongful conduct at the outset of the combination or agreement" are liable. *Id.* (citations omitted).

The petition pleads every element. Galvez alleges that Douglas Land and Frank Goldberg (and their respective corporate entities) engaged in transactions that "move[d] the assets of the old Elgin Butler Company into the new Elgin Butler Brick . . . without disclosure to Galvez[.]" Pet. at ¶ 14. Galvez also alleged that Goldberg in particular "had a history of personal animus against [him]" and that "he encouraged and actively collaborated with Land in fraudulently removing Galvez from any record equity ownership in [Elgin Butler Brick]." *Id.* at ¶ 30. As alleged, this total ownership exclusion occurred "intentionally and maliciously" despite significant money and previous investment from Galvez, who prior to the creation of Elgin Butler Brick had been the majority shareholder in the predecessor company. *Id.* at ¶ 29. From the petition, then, every element is met: (1) the Briar Defendants and Land (2–4) agreed to and together took steps to strip Galvez of equity, and (5) caused serious economic harm to Galvez.

The fifth element—damages—requires more explanation. Damages in civil conspiracy must result from an underlying tort rather than the conspiracy itself because civil conspiracy "is not an independent tort" under Texas law. *Agar Corp. v. Electro Cirs. Int'l, LLC*, 580 S.W.3d 136, 142 (Tex. 2019). Here, Galvez premises his civil conspiracy claim on the underlying tort of common-law fraud.[2] The Land Defendants accordingly

---

[2] Plaintiff titles his first count "Fraud (Statutory and Common Law)," without specifying more. Pet. at ¶ 28. The Court addresses only common-law fraud. *See* TEX. BUS. & COM. CODE § 27.01(a); *see also Brush v. Reata Oil & Gas Corp.*, 984 S.W.2d 720, 726 (Tex. App.—Waco 1998, pet. denied) ("The elements of statutory fraud under section 27.01 are essentially

contend that Galvez has not adequately pleaded a fraud claim—but he has.

For a plaintiff to prevail on a fraud claim, he must demonstrate "(1) the defendant made a material representation that was false; (2) the defendant knew the representation was false or made it recklessly as a positive assertion without any knowledge of its truth; (3) the defendant intended to induce the plaintiff to act upon the representation; and (4) the plaintiff actually and justifiably relied upon the representation and suffered injury as a result." *JPMorgan Chase Bank, N.A. v. Orca Assets G.P., L.L.C.*, 546 S.W.3d 648, 653 (Tex. 2018) (citation and internal quotation marks omitted). The fourth element requires both that the plaintiff "actually relied on the defendant's representation and, also, that such reliance was justifiable." *Id.* (citation omitted).

Galvez alleges that Land's false material representation was that "Galvez would remain the principal equity holder in [Elgin Butler Brick]." Pet. at ¶ 28. He alleges that he "reasonably and justifiably relied on those representations and continued to act from 2020 through September 2025" on the belief that he was the principal shareholder in the new company. *Id.* Finally, he concludes that Land fraudulently concealed a multitude of self-interested acts, including the erasure of any equity in both Egin Butler Brick and a related subsidiary (McIntyre Tile), as well as the "self-dealing asset sale" Land conducted in 2024. *Id.*

Paired with the rest of his complaint, this is sufficient to state a fraud claim. A material representation is one that "a reasonable person would attach importance to and would be

---

identical to the elements of common law fraud except that the statute does not require proof of knowledge or recklessness as a prerequisite to the recovery of actual damages.").

induced to act on [] in determining his choice of actions in the transaction in question." *Italian Cowboy Partners, Ltd. v. Prudential Ins. Co. of Am.*, 341 S.W.3d 323, 337 (Tex. 2011) (citation omitted). Here, Galvez alleges that Land, a long-time friend, business partner, and executor of his estate, represented to him (on his sickbed) that he would incorporate a new entity (Elgin Butler Brick) and make him the principal shareholder, just as he was in the Elgin Butler Company. Pet. at ¶¶ 2–5. In return, Land would "take on a minority share acting as Galvez's agent overseeing the management of the business." *Id.* at ¶ 4. No party asserts that Galvez has ever been the principal shareholder of Elgin Butler Brick, always making Land's (material) representation false and thus satisfying the first required element.

As for the second and third elements, Galvez alleges that Land and the Briar Defendants worked together knowingly with the purpose of "depriv[ing] Galvez of his equity in the restructured Elgin Butler [Brick]" and that Land "engaged in gross mismanagement and self-dealing . . . while Land reaped substantial gains[.]" *Id.* at ¶¶ 14, 16. The complaint paints the picture of Land knowingly misleading and eventually stonewalling Galvez, all to his own financial detriment.

The final element—reliance—is also present. For example, Galvez acted on the false and material representations by both making $600,000 available to Land—and also selling his life insurance policy to use as a "cash infusion" for Elgin Butler Brick. *Id.* at ¶¶ 4–5. Because Galvez thought he was the principal shareholder of Elgin Butler Brick, from a long-time friend and purported agent of his who owed him a fiduciary duty, *see infra* Part B, this reliance was justified.

But that is not all. Galvez alleges that Land never honored his end of the agreement and perennially requested money or assets from Galvez to aid the financially ailing Elgin Butler

Brick. And all the while, Galvez held no shares in the new entity, meaning that Galvez gave money and assets away for *nothing* in return. *Id.* at ¶¶ 4–5. Galvez's pleadings thus show that Land, as the (eventual) principal actor for Elgin Butler Brick, made a material, false representation to Galvez *and* induced him to act as his agent and to later financially aid Elgin Butler Brick—actions that were both justified and detrimental.

Taking the entire petition in the light most favorable to the Plaintiff, it is reasonable to conclude that the Briar Defendants are liable for alleged misconduct—namely, conspiracy to commit fraud.

### B. Limitations does not bar Galvez's civil conspiracy to commit fraud claim.

The Land Defendants argue that, even assuming Galvez has otherwise stated a claim for conspiracy to commit fraud against the Briar Defendants, the Briar Defendants are still improperly joined because this claim is barred by the statute of limitations. The Court disagrees. Although the fraud occurred in 2020, Galvez has sufficiently pleaded that his claim did not accrue at that time under the discovery rule because Land was his fiduciary and hid the transaction from him.

Fraud has a four-year limitations period. *See* TEX. CIV. PRAC. & REM. CODE § 16.000(a)(4). Civil conspiracy adopts the statute of limitations of the underlying tort (here, fraud), so a four-year statute of limitations applies to Galvez's conspiracy claim. *Agar Corp.*, 580 S.W.3d at 142–44 (Tex. 2019). In general, "[t]he statute of limitations begins to run when a claim accrues." *Id.* at 144 (citing *Murray v. San Jacinto Agency, Inc.*, 800 S.W.2d 826, 828 (Tex. 1990)). Accrual, in turn, occurs when the defendant's wrongful conduct causes legal injury—"even if the fact of injury is not discovered until later, and even if all

resulting damages have not yet occurred." *S.V. v. R.V.*, 933 S.W.2d 1, 4 (Tex. 1996). For civil conspiracy claims, accrual occurs "when the underlying tort accrues[,]" *Agar Corp.*, 580 S.W.3d at 145, so we examine limitations law surrounding fraud.

The Land Defendants argue that Galvez's civil conspiracy claim is time-barred because the underlying transaction that harmed Galvez allegedly occurred in 2020—outside the four-year limitations period.

Galvez does not dispute that is when the fraud occurred and caused him legal injury. He instead invokes the discovery rule, which is a "narrow exception" to the legal injury rule. *Berry v. Berry*, 646 S.W.3d 516, 524 (Tex. 2022).[3] This rule "defers accrual of a cause of action until the plaintiff knew or, exercising reasonable diligence, should have known of the facts giving rise to the cause of action." *Id.* (citation omitted). The rule applies "when the injury is by its nature inherently

[3] Land Defendants argue that Plaintiff did not plead the discovery rule, and so has forfeited that defense to the statute of limitations. ECF No. 12 at 14–15, ECF No. 20 at 15–16 (arguing "waiver," though the appropriate terminology is forfeiture); *see Rollins v. Home Depot USA*, 8 F.4th 393, 397 (5th Cir. 2021) ("Whereas forfeiture is the failure to make the timely assertion of a right, waiver is the intentional relinquishment or abandonment of a known right." (quoting *United States v. Olano*, 507 U.S. 725, 733 (1993) (citation and internal quotation marks omitted))). Not quite. While it is true that the "failure to plead facts demonstrating the applicability of the discovery rule constitutes a [forfeiture] of the discovery rule as a defense[,]" there is no hard-and-fast magic-words test that demands Plaintiffs to name the rule expressly in the complaint. *Monden v. Consol. Nuclear Sec. LLC*, No. 2:22-CV-004, 2022 WL 22858958, at *3 (N.D. Tex. Oct. 31, 2022). Rather, a plaintiff must plead facts "to put the defense on notice of the theories on which the complaint is based." *Colonial Penn Ins. Co. v. Mkt. Planners Ins. Agency, Inc.*, 1 F.3d 374, 376 (5th Cir. 1993) (discussing how in federal court, the discovery rule "need not be specifically pleaded"). It is enough for Plaintiff to allege sufficient facts to put Defendants on notice.

undiscoverable." *Agar Corp.*, 580 S.W.3d at 146 (citing *Childs v. Haussecker*, 974 S.W.2d 31, 36–37 (Tex. 1998)). An inherently undiscoverable injury "is by nature unlikely to be discovered within the prescribed limitations period despite due diligence." *Berry*, 646 S.W.3d at 524 (quoting *S.V.*, 933 S.W.2d at 7).

The injury here is inherently undiscoverable as alleged because Land owed fiduciary duties to Galvez. "[I]n the fiduciary context, it may be said that the nature of the injury is inherently undiscoverable," because fiduciaries "are presumed to possess superior knowledge." *Computer Assocs. Int'l, Inc. v. Altai, Inc.*, 918 S.W.2d 453, 456 (Tex. 1996). This presumption is based on the understanding that "a person to whom a fiduciary duty is owed is either unable to inquire into the fiduciary's actions or unaware of the need to do so." *S.V.*, 933 S.W.2d at 8.

The existence of a fiduciary duty is a question of law. *Meyer v. Cathey*, 167 S.W.3d 327, 330 (Tex. 2005). The "term 'fiduciary' is derived from the civil law" and in general "applies to any person who occupies a position of peculiar confidence towards another" and "refers to integrity and fidelity." *Kinzbach Tool Co. v. Corbett-Wallace Corp.*, 160 S.W.2d 509, 512 (Tex. 1942). Texas law recognizes that "agency is also a special relationship that gives rise to a fiduciary duty." *Johnson v. Brewer & Pritchard, P.C.*, 73 S.W.3d 193, 200 (Tex. 2002). Of course, "an agent is subject to a duty to his principal to act solely for the benefit of the principal in all matters connected with his agency[,]" though "duties owed by an agent to his or her principal may be altered by agreement." *Nat'l Plan Adm'rs, Inc. v. Nat'l Health Ins. Co.*, 235 S.W.3d 695, 700 (Tex. 2007) (citation omitted); RESTATEMENT (THIRD) OF AGENCY § 1.01 (A.L.I. 2006) ("Agency is the fiduciary relationship that arises when one person (a 'principal') manifests assent to another person (an

'agent') that the agent shall act on the principal's behalf and subject to the principal's control, and the agent manifests assent or otherwise consents so to act.").

"To establish an agency relationship, one must show a manifestation of consent by the purported agent to act on the principal's behalf and subject to the principal's control, together with a manifestation of consent by the purported principal authorizing his agent to act." *Cmty. Health Sys. Pro. Servs. Corp. v. Hansen*, 525 S.W.3d 671, 697 (Tex. 2017) (citation omitted). This relationship can be formed by oral agreement, written agreement, or by conduct, and "entitles the agent to act on the principal's behalf with the same force and effect as if the principal had performed the act himself." *Id.* The party asserting a relationship "has the burden of proving it by a preponderance of the evidence" as "Texas courts do not presume that an agency relationship exists." *Id.* (citing *IRS Res., Inc. v. Griego*, 221 S.W.3d 592, 597 (Tex. 2007)).[4]

The present case presents the situation where Galvez, after serious medical travails, "turned to a trusted friend, business partner and the executor of his estate for help in keeping Elgin Butler [Brick] afloat." Pet. at ¶ 3. And Galvez appears to allege that Land was his personal "agent." *Id.* at ¶ 4. Adding heft and color to this assertion, Galvez states that he "ma[d]e available to Land millions of dollars of cash and assets to carry out the restructuring summarized in the [Memorandum of Understanding], including an up-front investment of $600,000 . . .

---

[4] The parties obliquely mention—but do not include—a "Memorandum of Understanding" that was allegedly drafted by Land and signed by Galvez. In Texas, the Supreme Court has held that "common-law agency principles may be limited contractually" and that looking to the parties' written agreement is relevant. *Nat'l Plan Adm'rs*, 235 S.W.3d at 702 (citation omitted). For purposes of this motion to remand, the Court finds no reason to explore avenues the parties themselves do not find worthy of mention.

consistent with their agreement." *Id.* For this, "Land would take on a minority share acting as Galvez's agent overseeing the management of the business." *Id.*

Taking these allegations in the light most favorable to the non-movant, an agency relationship arguably existed and was governed both by the Memorandum of Understanding and by the oral agreement between Land and Galvez. Galvez gave Land control of his affairs and a large sum of cash to aid in Land's mission to right the Elgin Butler Brick ship. In return, Land received a minority stake in the new venture, and began to restructure and run the business. This is enough to establish an agent-principal relationship from which a common-law fiduciary duty would naturally flow.

This alleged relationship did not absolve Galvez of the "requirement of reasonable diligence." *Marcus & Millichap*, 659 S.W.3d at 462. The discovery rule defers accrual "until the claimant knew or should have known of facts that in the exercise of reasonable diligence would have led to the discovery of the wrongful act." *Berry*, 646 S.W.3d at 524 (citation omitted). But here, Galvez alleges that he neither knew nor should have known of such facts until 2024 or 2025. The petition portrays a fiduciary (Land) who was asked to step in and manage Galvez's affairs while he was undergoing intense, life-saving medical treatment, unable to do so without aid and in need of outside help at the time. Pet. at ¶¶ 3–4, 8–9, 14.

The facts as alleged plausibly show that, during that time, Galvez neither knew nor should have known of the fraud that was occurring, or of facts that he should investigate. *Id.* Rather, Galvez alleges that he learned facts that led to the discovery of the alleged wrongful acts only years later and well within the four-year limitations period for the conspiracy to commit fraud claim. *See, e.g.*, *id.* at ¶ 6 (listing "late 2024" as

the time when Land told Galvez he sold the principal assets of Elgin Butler Brick).

At present, it is plausible that the discovery rule would apply in the instant case. After all, "a person to whom a fiduciary duty is owed is either unable to inquire into the fiduciary's actions or unaware of the need to do so." *S.V.*, 933 S.W.2d at 8. And of course, "where a fiduciary relationship is involved[,]" the normal requirements of investigation are altered. *Willis v. Maverick*, 760 S.W.2d 642, 645 (Tex. 1988). So, dismissal due to a finding that the conspiracy claim was clearly out-of-time is inapposite.

The Land Defendants ask the Court to disregard these well-pleaded facts, pierce the pleadings, and consider a July 2020 email that they assert proves that Galvez knew (or should have known) that he was not a shareholder back in 2020. ECF No. 20 at 11–13. The Court declines to do so. The *en banc* Fifth Circuit has stated that where "a plaintiff has stated a claim, but has misstated or omitted discrete facts that would determine the propriety of joinder[,]" it lies in this Court's discretion to pierce the pleadings. *Smallwood*, 385 F.3d at 573. But the Fifth Circuit "caution[ed] that a summary inquiry is appropriate *only* to identify the presence of discrete *and undisputed* facts that would preclude plaintiff's recovery against the in-state defendant[s]." *Id.* at 573–74 (emphasis added). Piercing the pleadings is only for "fact[s] that easily can be disproved if not true." *Id.* at 574 n.12. After all, "[a]ttempting to proceed beyond this summary process carries a heavy risk of moving the [C]ourt beyond jurisdiction and into a resolution of the merits[.]" *Id.* at 574.

This is not an appropriate case to pierce the pleadings. While this correspondence might very well be used later on in litigation to determine whether Galvez's injury was "inherently undiscoverable," the discovery required to determine

exactly what he was doing, where he was, and how his health was during this time would require the Court to break away from the mandated "tight judicial tether." *Smallwood*, 385 F.3d at 574. The point of the motion to remand is to determine whether the Court has jurisdiction to hear the case, not to embark on a far-flung and roving discovery quest that goes to the very heart of the case. *See Guillory v. PPG Indus., Inc.*, 434 F.3d 303, 309 (5th Cir. 2005) (reiterating that in the fraudulent joinder context courts "do not determine whether the plaintiff will actually or even probably prevail on the merits of the claim, but look only for a possibility that the plaintiff might do so"). The Court therefore will not consider an email that requires more context to assess.

Dismissal is appropriate when a pleading "dispels *any notion* that the equitable [tolling] principles identified by [p]laintiffs would be available to save their claims." *King-White v. Humble Indep. Sch. Dist.*, 803 F.3d 754, 764 (5th Cir. 2015) (emphasis added). Galvez has stated a viable conspiracy claim against Briar Defendants under Texas law, making his joinder proper. And because the four Briar Defendants are citizens of Texas, there is no complete diversity and thus no diversity jurisdiction.

## CONCLUSION

The motion to remand (ECF No. 8) is GRANTED in part. The Court directs the Clerk of Court to transfer this case to the Texas Business Court. But Galvez's request for costs and fees is DENIED. *See* ECF No. 8 at 9. All other outstanding motions are DENIED as moot.

*So ordered by the Court on November 16, 2026.*



ANDREW DAVIS
United States District Judge